WHITE, respondent, *vs.* PARKER, appellant.

It is the duty of a guardian to get possession and control of his ward's personal property, and the rents and profits of his real estate; to keep and protect the same; to keep it invested; and to render a just and true account thereof, on the ward's becoming of age.

He cannot trade with himself, on account of his ward, nor buy or use his ward's property for his own benefit.

All advantageous bargains which a guardian makes, with the ward's funds, will enure to the benefit of the ward, at his election.

He cannot convert the personal property of his ward into real estate, or buy land with the ward's money. If he does so, his ward, when he arrives at full age, will be entitled, at his election, to take the land or the money, with interest.

He should keep his ward's property separate from his own; otherwise he will make it his own, so far as to be accountable for it, if lost.

If he takes notes or other securities, for money belonging to his ward, in his own name, he converts the property to his own use, and is prima facie accountable for it.

Thus if a guardian surrenders contracts for land, and takes deeds in his own name, and pledges his personal responsibility for a part of the purchase money, this will be held a conversion of the contracts to his own use; and the ward may adopt the transaction, or claim from the guardian the value of the land contracts, at his election.

A guardian, acting within the scope of his powers, is bound only to fidelity, and ordinary diligence and prudence in the execution of his trust. And his acts, in the absence of fraud, will be liberally construed.

A guardian is not responsible for open propositions made by him, in a preliminary talk or friendly conversation, before he assumes the duties of his trust. Nor is his surety liable for the conversations or open propositions of his principal before he became his surety.

The liability of a guardian and his sureties are simultaneous in their commencement, and co-extensive in their subject and duration.

*It seems* that where there is no proof as to the ability of a guardian safely to invest his ward's money on interest, he will be allowed a reasonable time to do so; usually six months.

A receipt may be explained, qualified, or even contradicted, by any evidence competent to establish a fact.

It is erroneous to charge a guardian with the face of a receipt given by him for his ward's property, and with interest on the amount therein specified, from its date, where it appears that he actually received no money, but only land contracts.

THIS was an appeal, brought in 1847, from a decree of the surrogate of the county of Erie, in the matter of the account-

White *v.* Parker.

ing of the appellant, as the guardian of the respondent. Early in the year 1826, and when Helen M. White, the respondent, was about one year of age, her father, George White, died intestate, leaving her, his only child and heir at law, under the protection of her mother ; and leaving some four or five thousand dollars worth of personal property, besides some real estate. On the 8th day of February, 1826, letters of administration of this estate were granted by the surrogate of Erie county, to Clarissa White the mother, and David P. White the paternal uncle of Helen. In the spring of the year 1829, the mother was married to one Henry C. Hickcox, and on the 20th day of June thereafter, she was appointed by the surrogate of Erie county, general guardian of her infant daughter, then about four years of age, and gave her second husband, Hickcox, and Asa and Truman Cary his relatives, as sureties for the faithful performance of her trust. There was no account of this trust for about seven years ; but it appeared that after the appointment of Mrs. Hickcox as guardian, the property of the ward was so managed, that on the 8th day of August, 1836, her friends became alarmed for its safety ; and one Cephas B. Dresser, her maternal uncle, in her behalf, presented a petition under oath, to the surrogate of Erie county, stating in substance that the said Clarissa Hickcox, the guardian of the said Helen, had permitted Hickcox, her husband, to take possession of Helen's property, and convert it to his own use, and he believed it was likely to be squandered. That the whole of it was then invested in the Buffalo land speculation, and that Hickcox, as the petitioner believed, had nothing to show for the amount received by him but contracts from the Holland company, and contracts for Buffalo lands ; and praying that the said guardian might be removed from her guardianship, and some other suitable person appointed. Before any proceedings upon this petition were had before the surrogate, a kind of preparatory verbal arrangement was made among the persons who took an interest in or assumed to conduct this matter, by which, as Mr. Dresser understood, it was agreed, by parol, in substance, that Mrs. Hickcox was to be discharged as guardian, and Aaron Parker appointed ; that

Hickcox was to give his note to Parker, payable in one year, for what was due from him to Helen for her property, and secure the payment by turning out land or land contracts; that Hickcox and his wife were to enter into articles of separation, and he was to give her land for what was owing to her from the estate of George White, her former husband, and the household furniture; and Parker was to be her trustee. On the 22d day of September, 1836, Cephas B. Dresser, the petitioner for the removal of Mrs. Hickcox from her guardianship, Henry C. Hickcox, Mrs. Hickcox, Truman Cary one of her bail as guardian, Charles B. Hyde her counsel, David P. White administrator of George White, deceased, Aaron Parker and Manuel Henshaw, all appeared before the surrogate of Erie county, upon which day the following transactions took place at the surrogate's office. *First.* Some kind of a liquidation or settlement by which it was estimated, computed or found, what amount of property belonging to the estate of George White, deceased, had passed into the hands of Hickcox for which he was indebted or liable to his wife and her daughter Helen, and upon which it was found that the amount due from him to his wife was $1302,08, and the amount due from him to her daughter was $3354,83. *Second.* The turning out by Hickcox of certain land contracts or articles of agreement for lands, in payment and satisfaction of those amounts. *Third.* The making and entering of an order by the surrogate, discharging Mrs. Hickcox, the former guardian, and her bail from all further liability. And an order discharging David P. White from all liability as administrator of the estate of George White, deceased. *Fourth.* The execution of articles of separation by Hickcox and his wife. *Fifth.* The appointment by the surrogate of Aaron Parker as the new guardian of Helen M. White, his acceptance of the trust, and giving of bail for its execution. *Sixth.* The giving of a receipt by Parker, by which he acknowledged that he had received from the surrogate the sum of $3354,83 as the money paid into court by the administrator of George White, deceased, which belonged to Helen M. White, the minor child of the said deceased, and that he received the same as guardian of the said mi-

nor. It was admitted before the surrogate, on the hearing of this
matter, that the respondent had attained the age of 21 years
and had a right to call the guardian to an account.   The above
statement is intended as a mere historical outline of the mat-
ters involved in this case, which were not denied by either party,
without reference to the legal validity of the transactions men-
tioned, and without including any of the disputed circumstan-
ces, which gave rise to this litigation.   The surrogate decreed
that Aaron Parker was accountable to his ward, on the receipt
of September 22d, 1836, for the sum of              $3354 83
Interest from Sept. 22, 1836, to June 22, 1847,       2524 49
Rent of house at Abbott's corners,                      50 00

Making in all the sum of                            $5929 32
And that he was indebted to her, over and above all
    credits in the sum of about                     $5255 59

This appeal was brought, by Parker, to review the principles
and grounds of that conclusion.

*P. G. Parker* and *S. G. Haven*, for the appellant.

*J. G. Masten*, for the respondent.

*By the Court*, MULLETT, J.   The examination of this case
involves an inquiry into the rights, duties and liabilities of one
of the most delicate and important artificial relations known to
civilized life—that of guardian and ward,—a relation by which
the guardian assumes, and is bound to the performance of ardu-
ous duties without compensation; and required to exercise a
parent's watchfulness, care and solicitude, without a parent's
hope; a relation by which not only the pecuniary rights, but
the moral character and all the elements of the future respecta-
bility, prosperity and happiness of bereaved and unprotected
childhood are confided to the care of one, who, however just
and conscientious he may be, is uninfluenced by those affections
which nature has so wisely provided for the security and guid-
ance of helpless infancy and inexperienced youth.   No wonder

the contemplation of such a subject should awaken in the bosom of the learned and refined advocate of the real or supposed rights of a complaining ward, feelings and sympathies honorable to human nature in its social character and relations—though useless if not dangerous to judicial investigation.

The safety of all our rights depends upon their being defined by written laws, which are alike beyond the reach of human passions and judicial discretion.    The process of adjudicating is but the applying of previously established principles to the case under consideration.    " The duty of a judge is that of severe and laborious examination." It was Lord Bacon, and after him our own venerated Kent, who laid it down as the duty of a judge to draw his learning from books and not from his own head.

The law prescribing the rights, duties and liabilities growing out of the relation of guardian and ward, is well settled, and manifests great practical knowledge of human nature, and a paternal solicitude for the welfare of the ward.  By it " the guardian's trust is one of obligation and duty, and not of speculation and profit."    In the performance of his duties, disinterested fidelity and ordinary diligence and prudence are required of him, and his compensation is confined to a mere indemnity. He must act for his ward and not for himself.   (1 *John. Ch.* 27, 394, 620. 4 *Id.* 303.)   The pecuniary subjects of his trust are the personal property and credits of his ward, and the rents and profits of his ward's real estate.   (2 *R. S.* 153, § 20.)   The guardian can not sell his ward's real estate, nor lease it for a term which will extend beyond his ward's minority.   (2 *Kent's Com. 1st ed.* 157. *Genet* v. *Tallmadge*, 1 *John. Ch.* 561.    *Field* v. *Schieffelin*, 7 *Id.* 154.)   It is the duty of a guardian to use all reasonable means to get possession and control of his ward's personal property, and the rents and profits of his real estate, and to collect the debts or money due to his ward ; and for that purpose he has power to bring the necessary actions.   (2 *R. S.* 150, § 3.) It is his duty to keep up and sustain the houses, gardens and other appurtenances to the lands of his ward by and with the profits of the land, or with such other money belonging to the

White *v.* Parker.

ward as he may have in his hands.  (2 *R. S.* 153, § 20.)  It is his duty with reasonable diligence and prudence to put his ward's money at interest.  And finally, it is his duty to obtain and keep the property of his ward, and to render a just and true account for it.  He can not trade with himself on account of his ward. He can not buy or use his ward's property for his own benefit. (1 *John. Ch.* 27, 394, 620.  4 *Id.* 203.  5 *Id.* 497.  7 *Id.* 174.) All advantageous bargains which he makes with the ward's funds shall enure to the benefit of the ward at his election.  He can not convert the personal property of his ward into real estate, or buy land with his ward's money.  If he do so, his ward, when he arrives at full age, will be entitled at his election to take the land or money with the interest.  (9 *Paige,* 90.) In short he can not bind his ward to any act injurious to him. He should keep his ward's property separate from his own : if he do not, he makes it his own, so far as to be accountable for it if lost.  He should not take notes or other security for money belonging to his ward, in his own name ; if he do so, he converts the property to his own use, and is prima facie accountable for it.  It has been held that if a guardian deposits his ward's money in his own name and it is lost, he is accountable for it.  (8 *Gill & Johnson,* 218.)  But a guardian is not required to exercise the extraordinary enterprise, perseverance and speculating sagacity and ingenuity which give some men peculiar facility for the acquisition of property.  While acting within the scope of his powers he is only bound to fidelity and ordinary diligence and prudence, in the execution of his trust. Holding guardians to a more strict responsibility would prevent men from assuming duties which are as necessary in society as they are profitless, and sometimes thankless, to those who perform them.  Where a guardian invested the cash of his ward in the promissory note of a person in good credit, and took what was regarded at the time as reasonable security for its payment, it was held that he acted in good faith and with sound discretion, and although the maker of the note failed, and the security became inadequate to its payment, yet that the guardian was not responsible for the loss.  (*Lovel* v. *Minot,* 20 *Pick.* 116.)

So, where the guardian sold the stock which he took as security for the payment of the note, and took the purchaser's note for the price, with two indorsers, and another note secured by a mortgage on land, he was held to have exercised a sound discretion, and not to be responsible for the loss occasioned by the failure of all the parties to the notes and the depreciation in the value of the mortgaged premises. (*Id.*) The same principle is recognized by Chancellor Kent. (2 *John. Ch.* 76.) In short, the guardian's duty is to receive and keep his ward's property, rather than to use and manage it for his ward's benefit.

These general principles are well known to every person at all acquainted with our system of equity jurisprudence, and their constant recognition will assist us in examining the case under consideration.

It is admitted that Aaron Parker was duly appointed guardian of Helen M. White, by the surrogate of Erie county, on the 22d day of September, 1836. That he accepted the trust, and gave the requisite security for its performance. It does not appear in the case, that the ward, immediately preceding the appointment of Parker as her guardian, had any real estate which she inherited from her father, except her interest in the house and lot at Abbott's corners, nor that any of the specific personal property which was left by her father was in existence, or that she had any money or property due to her, except what might be due from her mother as her former guardian, or her father's representatives. On the contrary, Mr. Dresser, in his petition of August 8th, 1836, states in substance that Helen's mother, her former guardian, had permitted Hickcox, her husband, to take possession of Helen's property and convert it to his own use, and that it was likely to be squandered; that the *whole of it* was then invested in the Buffalo land speculation, and that Hickcox had nothing to show for the amount received by him but contracts for land. And in his testimony before the surrogate, he says that it was understood that Hickcox had had Helen's personal property and used it in various ways, in drugs, and finally in land contracts, and had mixed it up with his own property; so that it may be fairly assumed that at the time of the com-

mencement of the proceedings to remove the former guardian and to procure the appointment of the new one, Helen's personal property and credits consisted of the claims which she had against her mother, as her former guardian, and her bail, and such as she might have had against her father's representatives. Nothing is claimed here on account of any demand against her father's representatives, and their accounts are not involved in this case.

The first breach of duty charged against Mr. Parker as guardian of Helen M. White, is in substance that he settled and compromised the claim against Mrs. Hickcox, the former guardian, and consented to her discharge, and thereby made himself accountable for that demand to its full amount, which is claimed to be $3354,83, whatever he may have received for it.

This charge presents an important point in the case, and deserves to be well considered. The true question is, did Parker, as guardian of Helen M. White, settle, compromise or discharge the demand of his ward against her former guardian? In examining this point before the surrogate, some reliance appears to have been placed by him on the testimony of Mr. Dresser, in relation to what understanding there was among the parties and their friends at home on the subject of the contemplated removal of the former guardian, the settlement of her accounts, the appointment of a new guardian, and the disposition of the property to be received on such settlement, and also in relation to Parker's consent and willingness to accept the appointment of guardian upon the removal of the former guardian. Neither the pertinency or force of this testimony is very perceptible. It is not pretended that the conversation or understanding to which it refers, of itself, imposes any obligation on Mr. Parker. Whatever he may have said or advised in a mere preliminary talk or friendly consulation, or whatever proposition he may have made or assented to in such consulations before he assumed the duties of a guardian, or whether he assumed those duties reluctantly or willingly, can have no influence on his legal responsibility for the performance of the trusts with which he was afterwards invested. When Parker was appointed guardian,

White *v.* Parker.

he gave bail for the faithful performance of his duties as such guardian ; then, and not till then, his fiduciary character commenced. His liability, and that of his bail, were simultaneous in their commencement, and co-extensive in their subjects and duration ; and it is not easy to perceive how bail for the performance of an executory duty, can be made responsible for the conversations or propositions of his principal before he became his surety, nor to understand how Parker in his fiduciary capacity can be held liable for conversations or propositions made by him before he was invested with that character.

It is not necessary in this case to decide whether or not, if Parker in contemplation of being appointed guardian, had received any money, or property or security for the payment of money, or the delivery of property in trust for his intended ward, and had held the same at the time of his appointment as guardian, such property would not have been considered a part of the trust assets in his hand and he and his bail accountable therefor. The evidence alluded to presents no such a case. All that Mr. Dresser testifies to on this subject is, that "there had been a conversation in relation to Helen's property between Dr. Hickcox, Mrs. Hickcox, lawyer Hyde, Esquire Parker, and himself, before we came down here (to the surrogate's office.) The understanding was that Mrs. Hickcox was to be discharged as guardian and Parker appointed. And Hickcox was to give his note, or notes, for what was due to Helen for her property, to Parker, payable in one year, and to secure the payment of it by turning out land or land contracts; this was the understanding in regard to Helen's matters. That as he understood it, notes were to be given for the amount of personal estate of George White, deceased, coming to Helen in hands of Hickcox as guardian." There is nothing in this testimony to show that Parker, before he was appointed guardian, had assumed any responsibility in the matter, or even that Hickcox had assumed any new obligation. There is nothing definite in this understanding—the amount due to the ward was not ascertained—and this understanding or preliminary arrangement, gave Parker no knowledge of that subject or control over

it. The kind of land or land contracts which Hickcox was to turn out was not even mentioned; and it was altogether optional with him whether he would give a note or turn out any land or land contracts. This understanding, at most, amounted to mere open propositions, which were binding on no one, and which either party had a right to change, and which were changed on the settlement before the surrogate—which Parker could not control, and by which settlement Hickcox was discharged upon turning out land contracts without a note. Finally, this preliminary understanding did not contemplate any action on the part of Parker but to accept the appointment of guardian, and as such to receive the notes and lands to be turned out by Hickcox. The settlement, from the nature of the transaction, must have been made by other parties, and proceedings were then pending on the petition of Mr. Dresser, to have it made before the surrogate.

But it is claimed that Aaron Parker, as the guardian of the respondent, did participate in the settlement of Hickcox and his wife before the surrogate, and consent to the discharge of their liability to his ward. This proposition must be founded on the testimony given before the surrogate. It is quite clear that the transaction called a settlement, by whomsoever made, included not only the liquidation of the amount due from Hickcox to his wife and her daughter, but also the turning out of the land contracts in payment of those amounts, and the discharge of his wife as guardian, and himself and the Carys as her bail. These were the objects of the proceedings before the surrogate. These were the conditions on which Hickcox had agreed to pay in land contracts. They were all simultaneous acts, and performed by the same parties. The evidence in support of the affirmative of this proposition is the testimony of Mr. Dresser and Truman Cary. Mr. Dresser states in substance that he was at the surrogate's office on the 22nd September, 1836; that Dr. Hickcox, Mrs. Hickcox, Charles B. Hyde, Truman Cary were there, *Aaron Parker a part of the time;* that he had some faint recollection that Mr. Henshaw was there; that David P. White was there a part of the time; that Hyde

was a lawyer and was there in rather a double capacity, if he understood it right. He was employed in the first place by Mrs. Hickcox to get a separation from her husband, and on that day acted as counsel for her and Parker; that Parker, Mr. Hyde, Hickcox and his wife and witness, were at the surrogate's office in the morning. Witness thought it was talked over there before the surrogate, how the matter should be settled, and they adjourned for dinner; that in the afternoon the parties appeared at the surrogate's office; that the accounts of Dr. Hickcox, the husband of Helen's guardian, were looked over and the amount due Helen ascertained, and also the amount due Mrs. Hickcox; after the amount was found, which occupied a good part of the afternoon:     *     *     *     *     *

" I do not recollect how long Esquire Parker was there, but know he was there some considerable time before we finally closed up the business. That the writings were made out as he supposed, but he did not recollect the particular time the orders were entered on the records. *As far as they could be done without Parker, he thought they were done before he came in.* The order was entered discharging Mrs. Hickcox and bail, and appointing Parker; after Parker returned it was concluded between him and Dr. Hickcox what articles he should take."

*Truman Cary*, one of Mrs. Hickcox's bail as guardian, testified in substance, that he was present on the occasion of the removal of Mrs. Hickcox from her guardianship, and the appointment of Parker, September 22, 1836. Hyde the lawyer, Hickcox and his wife, Mr. Dresser, Aaron Parker, Asa Cary, were there, and witness; thought Dr. Hickcox had a lawyer; that as near as he could recollect, they came from home in the morning and got to the office near 10 o'clock; that he thought there was but little done in the forenoon, if any thing, except to talk over the matter between some of the parties. All agreed to meet in the afternoon. That he thought all the persons he had named were there in the afternoon; that the amount of property that had passed into the hands of Hickcox was then estimated. Hickcox produced some articles for land, which, as witness understood, were to cancel the amount agreed upon for

which he was liable; that the surrogate made out a number of papers, could not say how many, and such as belonged to the parties to sign they signed, and such as belonged to him, the witness, to sign, he signed; that he understood that Mr. Parker was appointed guardian of Helen M. White on that day, *near the close of the matter.* That the surrogate made out the papers for the removal of the guardian, discharging of the bail and appointment of the new guardian, and they were executed about the same time, and if he recollected right, they were there about half the afternoon. That after the settlement and the amount which Hickcox owed, was ascertained, and an agreement to take articles had been made, the papers were made out. That he could not say that the assignments of articles were in writing or were not, or that they were assigned at all. That Mr. Hickcox produced the articles and laid them on the table; that he did not recollect that Hickcox signed any thing. On his cross-examination, this witness said he understood that the articles belonged to Hickcox. That he and his father were bail for Hickcox, and he supposed that the guardian settled up with the surrogate. That is, Hickcox and his wife as guardian for Helen M. White. That the principal actors were Mr. Dresser, Hyde, and Mrs. Hickcox. Hyde was a lawyer and he consulted with Mrs. Hickcox, Mr. Dresser and Mr. Hickcox. Hyde did the chief speaking. He also counselled with Mr. Parker towards the close. That he did not hear Mr. Parker say any thing. The settlement was to see how much Hickcox was owing. Hyde, Mr. Dresser and Mrs. Hickcox, took part in the settlement. *Could not say whether Parker did or not.* That the amount for which Hickcox was liable, was said to be ascertained at that time, and Hickcox presented the land contracts, he supposed. As soon as the papers were made out, the surrogate handed *them* the papers discharging the bail of the guardian. All the papers were delivered in half an hour after they commenced delivering them, and Parker received his. That he could not say that he heard any thing said about a receipt. The surrogate handed Parker a paper or papers, and he went to the window and read them.

That David P. White was there, but he could not say how much of the time, and could not say that he took any part in the settlement. On his direct examination being resumed, this witness testified that he could not say whether Parker was present or not when contracts were laid on the table. He thought he was present when the writings were signed. That in the course of the settlement, and in agreeing to take the contracts and to cancel the amount due from Hickcox, Mr. Dresser and Mrs. Hickcox consulted together, and he thought Parker part of the time. The evidence tending to establish the negative of the above proposition is found in the petition of Mr. Dresser, which was the foundation of the proceedings before the surrogate, his testimony, and the testimony of Manuel Henshaw and Samuel Caldwell, the surrogate before whom the proceedings were had, and the orders entered by the surrogate on that occasion.

Mr. Dresser, in the petition, states in substance that Mrs. Hickcox had permitted her husband to take possession of the property due to Helen from her father's estate and convert it to his own use. *That the whole amount was vested in land speculations, and that Hickcox had nothing to show for it but land contracts,* and in his testimony he states that at the time of turning out the land contracts by Hickcox, it was understood that they were not part of the personal property of George White deceased. That Hickcox had had Helen's personal property and used it in various ways, in drugs, and finally in land contracts, and had mixed it up with his own property. That he, the witness, felt anxious to get the property out of Hickcox's hands. He thought he and his wife would be better separated, and that it would be better for Helen to have her property out of his hands. The kind of land and land articles or property that were to be turned out was never agreed upon, till they came to the surrogate's office, as he understood it. That he knew that David P. White came there for a settlement. That he saw him there, and thought he was discharged on the accounts already rendered in the surrogate's office. He thought that was done before the business discharging the guardian was

done. That he, witness, took no part in the settlement of the administrator's accounts, nor interest in it. Manuel Henshaw, on this part of the case, testified in substance, that he was present when Aaron Parker became guardian of Helen M. White, and came to the surrogate's office with him for the purpose of being his bail. That they came to Mr. Caldwell's office together, in the fore part of the day, between nine and ten o'clock. That Mr. Caldwell said that he could not attend to the business then, and wanted them to come in in the afternoon. Parker and witness then left the office and went up street together, and returned to the surrogate's office together late in the afternoon, near sunset. That Mr. Caldwell then said the papers were made out and handed them to Mr. Parker. These were the bond and letters of guardianship. After the bond was read by Parker and witness it was executed by Parker, and witness as his surety. That they were at Mr. Caldwell's office but a short time. It is true, that Mr. Caldwell, when he first spoke of the receipt of Sept. 22d, 1836, said that as near as he could recollect, it was taken at the time of a settlement with the former guardian with Mr. Parker, the present guardian; but in his subsequent testimony on the subject under consideration, he said in substance, that he thought there was a change of guardian on the application of Mr. Dresser, a relative of the ward. It was represented that the husband of the former guardian was speculating with and squandering the estate of his ward. On that occasion Mr. Dresser, the applicant for the removal of the guardian, David P. White, administrator of George White deceased, and Mr. Manuel Henshaw, were present. Mr. Parker was there or came there at the time the business was closed, in time to sign the receipt, and he thought Mr. and Mrs. Hickcox with their counsel Mr. Hyde were there. These parties, or some of them, had frequently before that time been to his office and talked over this matter, and came that day to have a final settlement. That a settlement was made and consummated at that time, and he entered the order of September 22d, 1836, then before him. That he thought there were four land contracts produced then, either by Hickcox or the administrator, as the residue or wreck

of the property of the ward, to be passed over into the hands of the new guardian, Mr. Parker, then appointed. That there was nothing else, to his recollection. That there was a general representation to him by all the parties, that the property of the ward had been wasted in the hands of the guardian and that those contracts belonged to Hickcox, and that he had consented to turn them out to the ward with the understanding that this was to be a settlement between them. It was said that this was all that could be got. All the parties present consented to the arrangement. The former guardian was removed the same day, by an order entered on the application of Mr. Dresser, uncle of the ward and brother of the former guardian, and with her consent, which order was produced and of which the following is a copy:

" On reading the petition of Cephas B. Dresser in behalf of said minor and on hearing the parties, it is ordered that Clarissa Hickcox, wife of Henry C. Hickcox, be removed from said guardianship, and that the bail of said guardian be discharged from all further liability thereby."

This witness further testified that whatever settlement was to be made with the former guardian was made at that time, and the whole matter was settled and the order removing the former guardian entered. *That Parker had nothing to do with their consultations till after the order discharging Hickcox was entered.* That he had no recollection of Parker's being present, except the last day. That he thought the settlement took up most of the day, and that Mr. Parker was not there a great part of the time during the day. That the settlement was with the former guardian, *and Parker had no part in it.* That he did not mean to be understood that there was a settlement between the former guardian and Mr. Parker the new guardian. On his cross-examination, this witness testified that a settlement with the former guardian took place in his court, before him, on the 22d day of September, 1836. That he thought that on the settlement with the former guardian, Mr. Dresser was there, representing the ward and in her behalf; Mr. White, the administrator, also acting as her friend. Also thought Mr. Hyde, Mr. Hickcox and Mrs. Hickcox were present. That he thought there

Parker *v.* White.

was no order made appointing Mr. White or Mr. Dresser guardian ad litem for the ward. That he had no recollection that there was any account produced. The inventories of the administrator were produced, and he thought examined. Showed what property had been left to the ward; that it was ascertained what the amount was that went into the hands of the former guardian, but how he could not then say, except from the admissions of the parties. What made up the sum of the receipt, he could not then say. That he understood that Mr. Hickcox had taken money belonging to the ward out of Mrs. Hickcox's hands, and speculated and bought lots; and these contracts were parts of his purchases; that he had no recollection of the details of the settlements of the administrator's accounts, except from the records; that the same parties were present, and the settlements were made by consent and approbation of all; that he meant to say that he had no recollection of Parker's being there or participating in settlement till close of it.

The records of the surrogate made on the occasion of this settlement before him, (which although objected to I shall for the present consider properly in evidence,) throw some light on the real character of the transaction. The order discharging Mrs. Hickcox, the former guardian, and her bail, one of whom was Mr. Hickcox, does not appear to have been founded on any accounting by her with the surrogate. It merely states that on reading the petition of Mr. Dresser, and hearing the parties, it was ordered that she and her bail be discharged from all further liability, &c. The order discharging David P. White as administrator of George White, deceased, after reciting in substance that David P. White had prayed to be discharged from all further liability as such administrator; that the surrogate had examined his accounts and vouchers and was satisfied that he had faithfully and honestly administered the estate and completed the same; that he had paid into court the sum of $3354,83, by an assignment of certain contracts for lands, as the property of the minor child of the said deceased, and the sum of $1302,08 to the widow of the said deceased; Ordered that the said David P. White be discharged from all liability for or by reason of his

White *v.* Parker.

appointment as administrator. From the recitals in this order, it appears that the administrator paid into the surrogate's court these land contracts for the sums found to be due to the widow and daughter of the said George White, deceased, and thereupon procured himself to be discharged from all liability as administrator, &c. True these land contracts were the property of Mr. Hickcox, but they were paid into the surrogate's court, through the administrator, to his credit, and his discharge was founded on such payment. This is not inconsistent with the fact that Hickcox had received and squandered the property which belonged to his wife and her ward ; or that he was the person ultimately liable for that property. And it shows why the settlement was with him, as all the witnesses say it was, and how the payment by him to the surrogate, through the administrator, could, and did, procure the discharge of both his wife and her bail (of which he was one) and the administrator. The form of this transaction was the paying back to the administrator, by Hickcox, the amount of the property belonging to the estate of George White, deceased, which he had received, and the paying in of that amount to the surrogate's court by the administrator. Hence the settlement was confined to the ascertainment of the amount of property belonging to Helen and her mother, which had passed into Hickcox's hands. As the mother was not appointed guardian until after her marriage with Hickcox, it is not improbable that he had, in the name of his wife, received all this property, and that the amount of his indebtedness could be ascertained by the administrator's inventory. There is certainly no evidence in the case to show that Mrs. Hickcox, the guardian of Helen, ever rendered any account as such guardian, to the surrogate, or had any settlement with him.

I think the evidence clearly shows that the object of this family settlement was, to get from Hickcox what they could, on account of the property belonging to his wife and her daughter, which he had received and converted to his own use, and to transact the business before and under the sanction of the surrogate's court, in such a way as to enable the guardian and administrator to obtain discharges from their responsibility as such,

and to put such property as might be so obtained into the hands of a new trustee. And that the apparent effect of the arrangement, whether contemplated or not, was to avoid accountability to the new guardian, and deprive him of the power of calling his predecessor and her bail to an account. I can find no evidence in the case, showing with sufficient certainty that Parker had any participation in this transaction. On the contrary, the balance of the proof is that he had nothing to do with it. The nature of the settlement, as far as the liquidation of Hickcox's indebtedness was concerned, shows that Parker could not have participated in it, even if he had been authorized to take care of Helen's property. Hickcox was responsible for Helen's property, as bail for his wife, the former guardian. Besides, I think the evidence clearly shows that the settlement with Hickcox was made, the land contracts paid into court, the order discharging the former guardian and her bail, and the order discharging the administrator were entered, before Parker had become guardian. If any other evidence than that which is above stated were wanted, to sustain this proposition, it will be found in the testimony of Mr. Dresser, who swears in substance that there was no agreement what land contracts should be turned out by Hickcox, before they came to the surrogate's office; that after Parker returned it was concluded between him and Dr. Hickcox what articles he should take; that Dr. Hickcox objected in the first place to putting in the 212 acre lot, called the Hammond place; that Parker contended for it, and said he would have it, or have nothing to do with it. Almost all the witnesses testify that Parker did not return to the surrogate's office until near the close of the business; that the settlement with Hickcox had been made and the land contracts paid over to the surrogate before this time. This conduct in Parker is inconsistent with the idea that he had before agreed upon the receipt of those land contracts in payment and discharge of Hickcox's debt, or that he had then received his appointment as guardian. It is true that the land contracts, although passed over to the surrogate in payment and satisfaction of the debt which Hickcox owed, not only to Helen, but to her mother,

were to be formally assigned to the new guardian; but he received them from the surrogate as property in his hands belonging to Helen. It was on this occasion that Mr. Parker insisted on selecting out of those in the hands of the surrogate, such as he thought most beneficial to the trust he was about to assume. On the whole case, it appears to me clear, that Parker as guardian had no participation in or power to control the settlement with Hickcox, the receipt of the land contracts in discharge of his indebtedness, or the discharge of Mrs. Hickcox the former guardian and her bail, and that he is not responsible for any of these transactions, whether valid or not. That the surrogate mistook the facts proved and arrived at a wrong conclusion upon this part of the case.

An attempt was made upon the hearing before the surrogate, to prove that Hickcox, at the time of assignment of the land contracts to Parker, also gave him a note for the amount due to Helen, and that the land contracts were received by Parker as collateral security for the payment of that note, for the purpose of showing that there was a subsisting debt against Hickcox, in Parker's hands as guardian. This proof entirely failed. Mr. Dresser, the only person who spoke of a note being given, on his cross-examination, said that he could not testify that he saw such a note given by Hickcox on that occasion; and in mentioning over the papers which he heard read at the time, excludes the note, and speaks of a contract called a note. All the other witnesses on both sides, including Mr. Caldwell before whom the transaction took place, testify that there was no note, to their recollection. Besides, the whole transaction with Hickcox on that occasion was inconsistent with the presumption that he gave such a note. All the witnesses testify that he was to be discharged from his indebtedness, on turning out the land contracts: in fact, this was the condition on which he did turn them out. A further attempt was made to sustain this proposition by the admission of Mr. Parker. And Mr. Dresser testified that last fall (ten years after the transaction took place,) Mr. Parker confessed to him that he took such notes. That he said to Parker, "You took the doctor's note payable in one

year;" that Mr. Parker replied, "Yes, it was on condition that these articles or contracts should be redeemed in one year." James P. White, on this subject testified, "That in a conversation which he had with Parker in the early part of last winter, (more than ten years after the pretended transaction,) about taking a note from Hickcox, Parker said there was an obligation by Hickcox to him for the amount mentioned in his receipt, and spoke of a stipulation on his part that Hickcox was to have the land contracts back if he paid within a year." This testimony falls far short of proving that Parker, at the time of his appointment as guardian, received a note from Hickcox for a subsisting debt which he owed to Helen, but rather goes to show that Parker, after he had received the land contracts, made a bargain with Hickcox to reconvey them to him on condition that he would pay the amount for which he had turned them out, in one year, and took Hickcox's contract or obligation for the amount, on that condition. This transaction on the part of Parker was not a releasing or discharging any debt which was due to his ward, and did not in any way endanger or compromit her rights. Some proof was also given tending to show, or for the purpose of showing, that when Parker took the land contracts, he took them for, and absolutely assumed to pay the amount mentioned in his receipt. On this point, Mr. Dresser says that after Parker returned, it was concluded between him and Dr. Hickcox, what articles he should take. That Dr. Hickcox objected at first, to putting in the Hammond place; that Parker contended for it and said, "He would have it or have nothing to do with it: if he was going to be responsible for it he would be secured."

The counsel for the guardian, offered to prove that when the settlement took place before the surrogate, on the 22d September, 1836, the land contracts were delivered to Parker, and that he was told by the surrogate and by Mrs. Hickcox's counsel, that he would only be liable for what he could make out of them. Also, that Parker stated that he knew nothing about the land contracts, and was willing to be liable only for what he could make out of them, and refused to accept the guardian-

ship on any other terms ; which testimony was objected to on the part of the respondent, and rejected by the surrogate. I understand that all these remarks, as well those testified to by Mr. Dresser, as those offered to be proved on the part of the guardian, were made on the same occasion, at substantially the same time, and in the presence of the same persons. Dresser says that those which he testified to were made after Parker returned to the surrogate's office. All the witnesses testify that the business which had occupied a great part of the afternoon, was nearly completed when Parker returned. Dresser testified that as far as the writings could be done without Parker, they were done before he came in. Most of them have testified to their being present when the land contracts were delivered to Parker, and when he gave his bond as guardian. If it was competent for Dresser to testify to what Parker said on that occasion, I can not see why it was not competent for other witnesses to testify to what was said to and by him on the same occasion. Not only for the purpose of showing that Dresser was mistaken in his recollection, but also to show the whole conversation of which he had proved a part, or what led to or qualified that part which he had testified to. In short, if it was competent to prove Parker's remarks on that occasion, why it was not competent to prove all that he said, and all that was said to him on the same subject. I also think the rejected evidence was competent, independent of its pertinency, to explain the testimony of Mr. Dresser on that subject. It was competent to show that Parker had not then accepted of the guardianship. It was competent to show that Parker had not, as guardian, participated in the settlement, and agreed to the discharge of Mrs. Hickcox on the turning out by Hickcox of those land contracts. It was competent to show that Parker did not assume to be responsible to his ward for the whole amount of his debt on the faith of those contracts. They were not merely his declarations : they were a part of the *res gestæ* as much as the delivery of a deed is a part of its execution, the terms upon which it was delivered being always provable by parol. It was also competent to qualify and explain the receipt.

Another ground upon which the accountability of Parker as guardian is placed, is his receipt of September 22d, 1836, which is as follows: "Received, Buffalo, September 22d, 1836, of Samuel Caldwell, surrogate of Erie county, the sum of three thousand three hundred and fifty-four dollars and eighty-three cents, being the money paid into court by the administrator of George White, deceased, which belongs to Helen M. White, the minor child of the said deceased, and which sum I receive as the guardian of the said minor.

AARON PARKER."

This receipt Parker gave as guardian, and *prima facie* it makes him accountable for the sum mentioned in it, and for the due care and management of that sum, as guardian. But he now attempts to alter the measure of his responsibility, by showing that in fact, the receipt was given only for *the land contracts* which had been received by the surrogate from Hickcox through the administrator, and that he has faithfully taken care of, managed and disposed of them as the property of his ward, and that they were not in truth worth the sum mentioned in the receipt. This presents the question whether the receipt can be thus explained and qualified. That a receipt may be explained, qualified, or even contradicted, by any evidence competent to establish a fact, is a proposition which is settled by judicial decisions, which are too numerous and too uniform to justify a re-examination of the principles on which it is founded, or a reference to the authorities in its support. This is the English doctrine, the doctrine of the supreme court of the United States, and was adopted by our supreme court in 1799, in the case of *Ensign* v. *Webster*, (1 *John. Cas.* 145,) and has been steadily maintained ever since.

The soundness of the proposition on the part of the ward, that this is something more than a receipt because it was filed in the surrogate's office, is not appreciated, but if it was a part of the surrogate's records, why were the other simultaneous records on the same subject when offered in explanation of this record inadmissible? The first evidence offered to explain or qualify the receipt in question, was the order of Caldwell, the

White *v.* Parker.

surrogate, dated September 22d, 1836, discharging David P. White as administrator, &c. This order was objected to and rejected by the surrogate because (as he states in his amended return,) it did not show that the said Helen M. White had been made a party to the proceedings in which the order had been made, and was not bound by the same. The order was not offered as a *judgment* or decree binding upon or estopping the respondent. The validity of that order and the other simultaneous proceedings before Surrogate Caldwell, as against Helen M. White, is a question not involved in this case, nor examined as a part of it. The order was offered merely to show the amount and kind of property, which had gone into the hands of the surrogate as the property of the respondent, and been by the surrogate delivered over to Parker as her guardian, for which he gave the receipt, the foundation of her claim against him. The order which referred to the receipt, if admitted in evidence, would have shown that the receipt was given for certain land contracts which the surrogate had received from David P. White, as the property of Helen M. White, and handed over to Parker as her guardian. For this purpose, I think the order was competent, though not conclusive, evidence, within the principle laid down in 1 *Greenl. Evidence* 1, §§ 527, 538, 539. But whether the order was improperly rejected or not is a question of little consequence in the case, as the parol evidence conclusively shows that the receipt was given by Parker to the surrogate for the land contracts, and not for the sum of money mentioned in it; and I think the surrogate erred in adopting the sum mentioned in the receipt, as the foundation of Parker's accountability. The receipt, thus qualified, is evidence that Parker, on the 22d day of September, 1836, as the guardian of Helen M. White, received as her property, or for her benefit, four certain land contracts, which are more particularly described in the account rendered by Parker as guardian. Admitting that Helen M. White, when she arrived at the age of 21 years, had a right to disavow or disaffirm the whole of the negotiation and settlement of September 22, 1836, and had elected to do so, she would by that step have waived all claim against Parker

White *v.* Parker.

for the value of the land contracts; but she has not done so. She now claims to hold Parker liable as her guardian, on his receipt of that date.   If she claims under the receipt, her claim must be subject to the qualification of the receipt, which would reduce her demand to the claim against Parker for the land contracts or their value.

This brings us to an examination of the powers, duties and responsibilities of the guardian in reference to these land contracts.   These contracts were no part of the estate of George White, deceased, and therefore no part of the inheritance, or real estate, of his daughter; they were not assigned to her as such.   It can not consistently with the nature of the property represented by these land contracts, be supposed that Parker received it as the real estate of his ward, " to be kept for her benefit, and delivered to her when she should come to full age, in as good order and condition as when he received the same ;" and in the mean time to receive the rents and profits thereof. The lands covered by the contracts, were principally wild and unproductive, and the contracts would expire before the ward would attain her majority.   On the contrary these contracts represented a kind of equitable interest or property which the law would protect; which was the subject of sale and transfer as between the parties ; and the whole transaction shows that these contracts were assigned to Parker and received by him for the purpose of being sold for the benefit of his ward.   The fact that they were assigned to him in his own name, was calculated to facilitate such a disposition of them, but did not alter the measure of his responsibility for their value, no matter whether the ward consented to Parker's receiving those land contracts or not.   She has now a right to call upon him as her guardian to account for this property, which he received and assumed to hold and manage as hers.   Upon this construction of the trust, it was the guardian's duty, with reasonable ,diligence and prudence, to sell these land contracts, and to keep or dispose of the proceeds for the use and benefit of his ward.   If he sold them he is accountable for the proceeds of the sale ; if he improperly or unreasonably neglected to sell them, he is account-

able for their value.   This value is the real and not the imaginary value.   (*Osgood* v. *Franklin,* 2 *John. Ch.* 1 ; *S. C.* 14 *John.* 527.)   It is such sum as with reasonable diligence he might have received for them at any time while he held them ; in ascertaining which, the situation of the property as to title and other matters affecting its value may be taken into consideration.   (2 *John. Ch.* 1.   14 *John.* 527.)   But the guardian could not surrender these contracts, and by the addition of his own money, or otherwise, take the deeds of the land in his own name, and then rent, manage and improve it, at the risk and expense of the ward.   The land was not her property.   There is no reason to doubt that Mr. Parker, in taking the deeds of a part of the land covered by these contracts in his own name and pledging his personal responsibility for a part of the purchase money, pursued what he considered the best course, to enable him to save something for his ward ; but in doing so he transcended his powers as guardian, and violated a rule which was adopted for the protection of wards against the selfishness or fraud of their guardians, and which is too salutary in its general application, and too inflexible, to be relaxed in any particular case.   The question in such cases is not whether the guardian intended to defraud his ward or not, or whether the disposition which he made of his ward's property was beneficial or not, but is whether he had the power to bind his ward by such a transaction *without his consent.*   If he had not such power, the ward is not bound by the act of his guardian ; still the ward when he comes of age, may adopt the transaction and claim the benefit of it.   The ward in this case does not adopt the transaction, nor claim any share in the real estate.   The guardian is therefore accountable for the value of the ward's property which went into the consideration of the deed, with interest on the same, and is not responsible for the rents and profits of the land, nor entitled to claim the expenses and disbursements for taking care of and improving the real estate.

I also think that when the guardian sold any of the trust property on credit and took notes or other personal obligations for the price, in his own name, he made those notes or obliga-

tions his own, and must account for them at the value of the property for which he took them.

The surrogate's decree on the subject of interest was evidently based on the assumption that Parker, on the 22d day of September, 1836, actually received the sum of $3354,83, *in money*, on account of his ward. Even on this supposition, it appears to me that the decree is one of unusual, if not unprecedented severity, especially as the surrogate expressly exonerates the guardian from all charge of actual dishonesty or malfeasance. The surrogate by this decree makes the guardian responsible for the interest on the whole $3354,83, from the day he is supposed to have received it, to the time of making the decree, a period of about ten years and nine months, and amounting to $2524,49 of interest. I can find no case justifying such a rigid rule for the accountability of guardians or other trustees, who are not guilty of actual fraud. By the old rule, trustees were made responsible to the persons for whom the trust funds were held, for all gains made by the trustee from the trust fund. This was the only rule by which executors and guardians were chargeable with any thing beyond the capital of the trust fund. More recently it has been held that where these trustees have omitted to invest a fund which they *might and ought* to have made productive, they shall be charged with simple interest. Compound interest has also been charged in cases of gross delinquency, such as refusing to render an account, or violation of an express direction of the trust, &c. (*Hopkins' Rep.* 424, *and the cases cited.*) It is true that guardians are bound to use due diligence to invest their wards' money on interest, but they are to have a reasonable time to do so. When there is no proof on the subject of the ability of the guardian safely to invest his ward's money on interest, the time usually allowed as reasonable is six months. (*Dunscomb* v. *Dunscomb,* 1 *John. Ch.* 508. *Clarkson* v. *De Peyster, Hopk. Rep.* 424, 505. *Hooker and wife* v. *Royster and wife,* 1 *Munf.* 119 *to* 133.)

This was also the rule of the English law, and prevails in most, if not all, the United States. In this case, even on the supposition that Parker received the sum of *money* mentioned

White *v.* Parker.

in the receipt, on the day of its date, there was no proof that he had an opportunity safely to invest it on interest; and he should have been allowed the usual six months for that purpose. It does not appear in this case that Parker ever used a dollar of *money* belonging to his ward, in any profitable business of his own, so as to render himself liable to pay interest on that account. The payment of interest in such a case is based upon the rule that the ward is entitled to the gain made from the use of his money. But under the view which we have taken of the whole of this matter, this last error cannot be repeated in this case, and it is noticed more for the purpose of showing our dissent from the principle on which it was founded, than for controlling any future action in this matter.

On the whole matter as it appeared before the surrogate, I am clearly of opinion that he erred upon the points which I have examined, and that his decree must be reversed; that the matter must be remitted to the surrogate to proceed in the accounting upon the evidence before him, and upon such other competent evidence as the parties may produce; that on such accounting, the basis of the guardian's accountability must be the value of the land contracts which he received from the surrogate on the 22d of September, 1836. That the value must be the real, and not the imaginary value, of the land contracts; or such sum as he might with reasonable diligence have obtained for them, at any time while he held them, or at the time he disposed of them; or the sum which he obtained for them, at the election of the ward; and that these are facts depending on the testimony before the surrogate. And that a decree, to be settled by one of the justices of this court, be entered accordingly. No costs on this appeal to be allowed to either party.