The subject-matter of the article seems to be distributed among these different subject headings: "Loss of school moneys apportioned," characterizes section 1; "of forfeiture by school officers by reason of neglect to sue for penalties," section 2; "of costs in suits which might have been the subjects of appeal to the superintendent of public instruction," section 3; "of costs in suits, actions and proceedings other than appeals to the superintendent of public instruction," characterizes and qualifies sections 4, 5, 6, 7, and 8. It will thus be seen that this article has nothing to do with costs and expenses incurred in prosecuting an appeal before the superintendent of public instruction, and therefore it cannot be made the basis of this application. It would seem that if, by any possibility, this were a case where the expenses incurred by the respondent, situated as this one is, could be imposed upon a school district through the medium of a tax levy, it would have to be by virtue of subdivision 19, § 14, art. 1, tit. 7, which provides:

"The inhabitants entitled to vote when duly assembled in any district meeting, shall have power by a majority of the votes of those present * * * to vote a tax to replace money of the district lost or embezzled by district officers and to pay the reasonable expenses incurred by district officers in defending suits or appeals brought against them for official acts, or in prosecuting suits or appeals by direction of the district against other parties."

Perhaps, on failure to allow the account, if proper, an appeal might be had to the superintendent of public instruction, under title 15 of that act, and his decision would be conclusive on the district. The application must therefore be denied, without costs.

Application denied, without costs.

---

(31 Misc. Rep. 477.)

## In re TERRY'S ESTATE.

(Surrogate's Court, Cattaraugus County. May, 1900.)

PROPERTY OF GUARDIAN—SALE TO FATHER OF WARD—MORTGAGE TO GUARDIAN—APPROPRIATION OF WARD'S MONEY—LIABILITY OF GUARDIAN.

Where a guardian sold a piece of land to the wards' father for $500 in cash, and a mortgage on the land for $1,000 in favor of himself as guardian, and appropriated $1,000 of the wards' money (the amount of the mortgage) to his own use, and a default was made in the payment of the mortgage, and the land greatly decreased in value, the guardian was liable to the wards for the $1,000.

Judicial accounting of Ransom Terry as guardian of certain wards. Decree in favor of wards.

George E. Spring, for petitioner.
W. W. Waring, for contestants.

DAVIE, S. On the 20th of April, 1885, letters of guardianship of the estate of John and Henry Hurlburt were issued by the surrogate of Cattaraugus county to the petitioner, who entered upon the discharge of his duties as such guardian, and so continued until the wards became of age, and he now files his account and petition for a judicial settlement of the same; such account showing that the only asset in his hands as guardian is the mortgage hereinafter referred to. The mother of the wards died some time prior to the is-

suing of such letters of guardianship, leaving, her surviving, her husband and her two sons, John and Henry. After her death the husband married again, and he died intestate in 1886, leaving a widow, and an infant daughter by his second wife. The mother of the wards was insured at the time of her death, the beneficiaries under such policies of insurance being the husband and the two sons. The adjustment of such insurance was delayed for some time after her death, in consequence of litigation, but was finally settled upon the basis of paying the sum of $1,000 to the wards, and a certain sum to the husband, the particular amount of which does not appear. The $1,000 belonging to the wards came into the hands of the petitioner, as their guardian, shortly after the issuing of the letters of guardianship. At the time of receiving this money the petitioner was the owner of a tract of land in the town of Ischua, containing 60 acres, little of which was improved or cleared, lying mainly on the hillside, and entirely without buildings or substantial improvements. On the 30th day of June, 1885, the petitioner conveyed this land to Edward Hurlburt, the father of the wards, for a consideration, as expressed in the deed, of $1,500. A part of his purchase price was paid by the petitioner retaining the sum of $500, then in his hands, belonging to the grantee, and derived from the insurance above referred to. To secure the payment of the remaining $1,000 of the purchase price, Edward Hurlburt executed his bond and mortgage on these lands for $1,000 to the petitioner as guardian, conditioned for the payment of that sum in 10 years, with interest annually, and also providing that the mortgagee might, if he desired, deem the entire sum (principal and interest) due and payable in case of default in payment of interest. The grantee took possession of this land after the making of the deed, built an inexpensive house thereon, but failed to make any other improvements, or to make any payments of principal or interest on the bond and mortgage. At the time of the execution of the deed and mortgage these lands were fairly worth the sum of $1,000, and so continued until after the death of Edward Hurlburt; but soon after his death, however, they began to depreciate rapidly in value, and such depreciation continued during the minority of the wards, and at the present time these lands are worth much less than the face of the mortgage. After Hurlburt's death the petitioner assumed the control of these lands, and rented the same from time to time; the income derived therefrom, however, being insufficient to pay the taxes. After the wards arrived at the age of 21, the petitioner proposed to John Hurlburt to turn over the mortgage and the possession of the lands to the wards, on condition that they pay to him $100 for his services, and $25 to his attorney. This proposition was not accepted, and the wards now insist upon their right to recover $1,000 and interest.

However harsh the enforcement of this demand against the guardian may seem, there are certain well-defined legal rules regulating the conduct of guardians in the performance of their trust that cannot be ignored. The relation between a general guardian and his infant ward is that of trustee and cestui que trust. Warren v. Bank, 157 N. Y. 259, 51 N. E. 1036, 43 L. R. A. 256. No actual fraud need be shown on the part of a trustee, to make him personally liable,

where he deals for his own benefit with the trust funds. Jewett v. Miller, 10 N. Y. 402; Fulton v. Whitney, 66 N. Y. 548–555; Colburn v. Morton, *42 N. Y. 296; Gardner v. Ogden, 22 N. Y. 327–344; Van Epps v. Van Epps, 9 Paige, 237. The office of guardian is peculiarly one of trust and obligation; and while, as a general proposition, they are not insurers of the safety of the trust estate, and are required to employ only such prudence and diligence in the discharge of their duties as men of average prudence and discretion under like circumstances employ in their own affairs (Purdy v. Lynch, 145 N. Y. 462, 40 N. E. 232), yet the guardian is bound at all times to act for the interest of his ward, rather than his own. Whenever he seeks to gain a personal advantage at the expense of his ward, such act will be annulled by the court. 9 Am. & Eng. Enc. Law, 155; White v. Parker, 8 Barb. 48–52; Schieffelin v. Stewart, 1 Johns. Ch. 620; Brown v. Rickets, 4 Johns. Ch. 303. Unauthorized acts, even if done in good faith, are undertaken at the risk of the guardian, and if they prove beneficial to the ward the court will adopt them. If detrimental, he is personally liable for the loss. Jackson v. Sears, 10 Johns. 435; Milner v. Harewood, 18 Ves. 259; 9 Am. & Eng. Enc. Law, 107. Persons standing in relations of trust are not permitted to speculate in the trust property. Lewin, Trusts, par. 279; Welch v. Woodruff (Sup.) 3 N. Y. Supp. 622. If a guardian sells his own property to his ward, the latter can ignore the sale and recover the price and interest, regardless of whether such sale was made in good faith or not. Hendee v. Cleaveland, 54 Vt. 142. Under the authorities cited, it is apparent that a direct sale of this land by the petitioner to the wards would have been entirely unauthorized. If the petitioner at some former time had sold the land to another, and taken back a mortgage in his own name, he could not have justified the assignment of such mortgage to the wards, in case it proved inadequate security; nor could the guardian by indirect methods be permitted to accomplish a result which would not be sanctioned if directly performed. The sale of this land to Hurlburt by the guardian, taking back the $1,000 to himself as guardian, and thereupon appropriating the moneys of the wards, was in effect an exchange, by indirect methods, of the petitioner's lands for the moneys of his wards,—a transaction which cannot be sanctioned without utterly disregarding the salutary rules recognized by the cases cited. It must be held that the petitioner is liable to account for the principal sum of $1,000, but he having in fact derived no interest or income therefrom, and it being a matter of common observation that it is difficult to so invest a trust fund as to continuously produce the full legal rate of interest, I am not disposed to charge him with interest at the rate of 6 per cent. He should, however, account for and be charged with interest on this fund from the date of its receipt to the date of this decree at the rate of 3 per cent. Under this disposition of this claim, the mortgage in question belongs to the petitioner personally, and should be transferred to him, so that he may enforce it in his own name. A decree will be entered in accordance with the foregoing conclusions.

Decreed accordingly.